**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse     40 Foley Square, New York, NY 10007 Telephone:  212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): **15-1164-cv**                                    Caption [use short title]

Motion for: **Leave to File a Brief as Amicus Curiae**    **Flo & Eddie, Inc. v. Sirius XM Radio, Inc.**

Set forth below precise, complete statement of relief sought:

**Motion of Pandora Media, Inc. for Leave to**

**File a Brief as Amicus Curiae in Support of**

**Defendant-Appellant Sirius XM Radio, Inc.,**

**Seeking Reversal of the District Court's**

**Decision**

MOVING PARTY: **Amicus Curiae**                          OPPOSING PARTY: **Flo & Eddie, Inc.**

☐ Plaintiff               ☐ Defendant
☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: **R. Bruce Rich**                       OPPOSING ATTORNEY: **Harvey Geller**

[name of attorney, with firm, address, phone number and e-mail]

**Weil, Gotshal & Manges LLP**                           **Gradstein & Marzano PC, 6310 San Vicente**

**767 Fifth Ave., New York, NY 10153**                   **Blvd., Ste. 510, Los Angeles, CA 90048**

**(212) 310-8000, bruce.rich@weil.com**                  **(323) 776-3100, hgeller@gradstein.com**

Court-Judge/Agency appealed from: **United States District Court, Southern District of New York**

Please check appropriate boxes:                          FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                         INJUNCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):   Has request for relief been made below?        ☐ Yes ☐ No
☑ Yes ☐ No (explain):_____                     Has this relief been previously sought in this Court?  ☐ Yes ☐ No
                                                         Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested?    ☐ Yes ☑ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

_R. Bruce Rich_____ Date: **8/5/2015**        Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 15-1164-cv

## United States Court of Appeals

### for the

## Second Circuit

FLO & EDDIE, INC., a California Corporation, individually
and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

– v. –

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**MOTION OF PANDORA MEDIA, INC. FOR LEAVE TO FILE A
BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-
APPELLANT SIRIUS XM RADIO, INC., SEEKING
REVERSAL OF THE DISTRICT COURT'S DECISION**

R. BRUCE RICH
BENJAMIN E. MARKS
GREGORY SILBERT
TODD LARSON
KAMI LIZARRAGA
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Amicus Curiae*

Pursuant to Fed. R. App. P. 29(b), Pandora Media, Inc. ("Pandora") moves for leave to file the accompanying proposed brief, attached as Exhibit A, as *amicus curiae* in support of Defendant-Appellant Sirius XM Radio Inc.'s ("Sirius XM") appeal, seeking reversal of the District Court's Memorandum Decision and Order, dated November 14, 2014, denying summary judgment and its Memorandum Decision and Order, dated December 12, 2014, denying reconsideration.

Pandora, the proposed *amicus curiae*, is the largest provider of Internet radio service nationwide. Pandora's advertising-supported service is available for free throughout the United States. Most of Pandora's sound recordings are protected by federal copyright law, under which Pandora maintains uninterrupted access to the necessary public performance rights pursuant to federal statutory licenses. Pandora also performs sound recordings fixed before February 15, 1972 that, until now, have never been subject to public performance rights under state or federal law.

Pandora requests permission to offer its unique perspective as a radio industry leader on the serious threat posed by the district court's decision to the careful balance, struck nationwide, ensuring the public's uninterrupted access to sound recording performances. Until a recent spate of lawsuits, the historic treatment of public performance rights for sound recordings has been the exclusive province of Congress, which over nearly a century has established a carefully-calibrated system that governs the daily practice of myriad entities nationwide.

1

The proposed brief seeks to provide this Court with further explanation as to why a newly announced common law public performance right will effect a sea change in the law that threatens to destabilize numerous industries and for the first time restrict the public's uninterrupted access to sound recording performances.

Pandora sought the consent of all parties to the filing of its proposed brief as *amicus curiae*. Appellant Sirius XM provided its consent. Respondent Flo & Eddie, Inc., however, did not.

Accordingly, Pandora respectfully requests leave to file the accompanying brief as *amicus curiae* in support of Appellant Sirius XM.

Dated:  New York, New York          Respectfully submitted,
        August 5, 2015

                              /s/ R. Bruce Rich
                              R. Bruce Rich
                              Benjamin E. Marks
                              Gregory Silbert
                              Todd Larson
                              Kami Lizarraga
                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              T:  (212) 310-8000
                              F:  (212) 310-8007

                              *Counsel for Amicus Curiae*

# EXHIBIT A

# 15-1164-cv

## United States Court of Appeals
### for the
## Second Circuit

———◆�index◆———

FLO & EDDIE, INC., a California Corporation, individually
and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

– v. –

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF PANDORA MEDIA, INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT SIRIUS XM RADIO, INC., SEEKING REVERSAL OF THE DISTRICT COURT'S DECISION

R. BRUCE RICH
BENJAMIN E. MARKS
GREGORY SILBERT
TODD LARSON
KAMI LIZARRAGA
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pandora Media, Inc. is a publicly owned corporation. Pursuant to Federal Rules of Appellate Procedure 26.1 and 29, Pandora Media, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its shares.

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF INTEREST ............................................................................1

SUMMARY OF ARGUMENT ..........................................................................4

ARGUMENT ....................................................................................................8

I.  The Legislature, Not The Courts, Should Balance The Competing
    Interests And Make The Policy Choices Involved In The Creation Of
    A Public Performance Right For Pre-1972 Recordings ................................8

II. The District Court's Determination That A Public Performance Right
    In Sound Recordings Has Always Existed Under New York Law—
    But Went Unenforced—Is Undermined By The Extensive History Of
    Failed Legislative Efforts To Secure Such A Right And The Carefully
    Circumscribed Nature Of The Federal Public Performance Right ..............13

III. The District Court's Decision, If Affirmed, Will Unleash Widespread,
     Inequitable Burdens On Numerous Industries ............................................23

    A.  Satellite And Internet Radio Services ..................................................24

    B.  Traditional Radio Broadcasters ...........................................................26

    C.  Restaurants, Bars, And Other Small Businesses ..................................27

    D.  Local Television Broadcasters And Cable Television System
        Operators ............................................................................................27

CONCLUSION ................................................................................................30

i

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Ackoff-Ortega v. Windswept Pac. Entm't Co.*,
    130 F. Supp. 2d 440 (S.D.N.Y. 2000) ...............................................................13

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
    650 F.3d 876 (2d Cir. 2011) .............................................................................12

*Broadcast Music, Inc. v. DMX, Inc.*,
    683 F.3d 32 (2d Cir. 2012) ...............................................................................22

*Campaign for Fiscal Equity, Inc. v. State*,
    8 N.Y.3d 14 (2006) ..........................................................................................11

*Capitol Records, Inc. v. Naxos of America, Inc.*,
    4 N.Y.3d 540 (2005) ........................................................................................13

*City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*,
    877 F.2d 1146 (2d Cir. 1989) ......................................................................12, 13

*Cornellier v. Am. Cas., Co.*,
    389 F.2d 641 (2d Cir. 1968) .............................................................................13

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)............................................................................................8

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
    No. 13-23182-CIV, 2015 WL 3852692 (S.D. Fla. June 22, 2015) ...................25

*Garland v. Herrin*,
    724 F.2d 16 (2d Cir. 1983) ...............................................................................13

*Hall v. United Parcel Serv. of Am., Inc.*,
    76 N.Y.2d 27 (1990) ......................................................................................9, 10

*Klostermann v. Cuomo*,
    61 N.Y.2d 525 (1984) .......................................................................................11

*Meredith Corp. v. SESAC, LLC*,
    1 F.3d 180 (S.D.N.Y. 2014)..........................................................................22, 28

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
    92 N.Y.2d 458 (1998) ........................................................................11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417, 429 (1984)................................................................8, 10

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975)..........................................................................8, 9

**Statutes**

17 U.S.C. § 106 ..........................................................................*passim*

17 U.S.C. § 107 ................................................................................10

17 U.S.C. § 108 ................................................................................10

17 U.S.C. § 109 ................................................................................10

17 U.S.C. § 110 ..........................................................................10, 27

17 U.S.C. § 111 ................................................................................10

17 U.S.C. § 112 ..........................................................................10, 25

17 U.S.C. § 114 ..........................................................................*passim*

17 U.S.C. § 301 ..................................................................................2

17 U.S.C. § 512 ..........................................................................19, 20

17 U.S.C. § 801 ....................................................................18, 19, 20

17 U.S.C. § 802 ....................................................................18, 19, 20

17 U.S.C. § 803 ....................................................................18, 19, 20

17 U.S.C. § 804 ....................................................................18, 19, 20

17 U.S.C. § 805 ....................................................................18, 19, 20

N.C. Gen. Stat. § 66-28 (2015) .......................................................26

S.C. Code Ann. § 39-3-510 (2015) ..................................................26

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ....................17, 19

**Rules and Regulations**

37 C.F.R. § 380 (2014) .......................................................................20

37 C.F.R. § 382 (2014) .......................................................................20

37 C.F.R. § 383 (2014) .......................................................................20

37 C.F.R. § 384 (2014) .......................................................................20

Fed. R. App. P. 29 .................................................................................1

Local Rule 29.1 ....................................................................................1

**Other Cited Sources**

93 Cong. Rec. D406 (daily ed. July 21, 1947).......................................16

117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) ......................................17

*Authorizing a Composer's Royalty in Revenues from Coin-operated Machines and to Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm. on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary on H.R. 1269, H.R. 1270, and H.R. 2570*, (Comm. Print 1947)...15, 16

Brief for George Akerlof *et al.* as *Amici Curiae* Supporting Petitioners at 2, *Eldred v. Ashcroft*, 537 U.S. 186 (2003) (No. 01-618) ....................................8

"Comments of Recording Industry of America (RIAA) and American Association of Independent Music (A2IM)," *In the Matter of: Fed. Copyright Protection of Sound Recordings Fixed Before Feb. 15, 1972*, Dkt. No. 2010-4, U.S. Copyright Office (Jan. 31, 2011) ......................................................21

Flo & Eddie's Mem. of Law in Opp'n to Sirius XM's Mot. for Summ J., *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325 (S.D.N.Y. 2014) (No. 13 Civ. 57684 (CM)) ......................................................................21

*General Revision of the Copyright Law: Hearings Before the H. Comm. on Patents* (1932).....................................................................................14

H.R. 1270, 80th Cong. (1947)...............................................................15

iv

H.R. 4347, 89th Cong. (1965).....................................................................16

H.R. 10434, 69th Cong. (1926)...................................................................14

H.R. Rep. No. 83 (1967) ............................................................................17

H.R. Rep. No. 92-487 (1971) .....................................................................17

H.R. Rep. No. 104-274 (1995)..................................................14, 17, 18, 20

MICHAEL JAMES ROBERTS, TELL TCHAIKOVSKY THE NEWS:  ROCK 'N' ROLL, THE
LABOR QUESTION, AND THE MUSICIANS' UNION, 1942–1968 (Duke Univ. Press
2014) ........................................................................................................15

Pandora Form 10-K filed Feb. 11, 2015 ......................................................1

Pandora Form 10-Q filed Apr. 27, 2015 .......................................................1

ROBERT D. LEITER, THE MUSICIANS AND PETRILLO (Bookman Associates 1953) .15

S. 1006, 89th Cong. (1965) ........................................................................16

S. Rep. No. 92-72 (1971) ...........................................................................17

*Supplementary Register's Report on the General Revision of the U.S. Copyright
Law* (1965), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer on
Copyright*, App. 15 (Lexis 2013) ..............................................................16

*Testimony of the NAB Before the H. Judiciary Comm. Subcomm. on Courts &
Intellectual Property: Hearing on H.R. 1506* (June 21, 1995)..........................26

Pandora Media, Inc. ("Pandora") respectfully submits this brief as *amicus curiae* in support of Defendant-Appellant Sirius XM Radio Inc.'s ("Sirius XM") appeal from the District Court's Memorandum Decision and Order, dated November 14, 2014, denying summary judgment and its Memorandum Decision and Order, dated December 12, 2014, denying reconsideration.[1] Pandora submits this brief together with a motion for leave to file pursuant to Fed. R. App. P. 29(b).

## STATEMENT OF INTEREST

Pandora is the largest provider of Internet radio service in the United States. In addition to offering pre-created stations, Pandora enables users to "create" stations by specifying the name of an artist, song, or genre. Pandora uses the intrinsic qualities of a user's selection to generate a radio station tailored to the user's continuing feedback. Pandora Form 10-Q filed Apr. 27, 2015 at 7. Users can access digital streams of the stations they create through Internet-connected devices. *Id.* Pandora's advertising-supported service is available for free throughout the United States. *See* Pandora Form 10-K filed Feb. 11, 2015 at 3, 8. Pandora submits this brief to provide its perspective as a radio industry leader on the untoward impact that an affirmance of the district court's ruling in this case

---

[1] In accordance with Fed. R. App. P. 29(c)(5) and Local Rule 29.1, Pandora, as *amicus curiae*, states that this brief was not authored in any part by counsel to any party, and that no monetary contribution to the preparation or submission of this brief was made by any person or entity other than the *amicus curiae* and its counsel.

would have on the public's access to the range of music that New York law, like federal copyright law and policy, heretofore has enabled.

The historic treatment of public performances of sound recordings, until a recent spate of lawsuits, has been the exclusive province of Congress, to which all legal and policy arguments surrounding the issue have been addressed. Congress's carefully calibrated responses over the better part of a century have set the legal parameters that have guided day-to-day practice by myriad entities nationwide. The district court's holding that New York independently recognizes—indeed, though never enforced, purportedly always has recognized—a common law right of public performance in sound recordings contravenes all prior experience, undermines settled commercial expectations, and threatens deeply destabilizing results for thousands of businesses, educational institutions, and governmental entities that make public performances of music in New York. Because of the numerous competing public and private interests that must be balanced, the choice to establish such a right should be made, if at all, by the legislature—not by a federal court declaring New York common law.

Most of the sound recordings performed by Pandora were created on or after February 15, 1972 ("post-1972 recordings") and are governed exclusively by federal copyright law. *See* 17 U.S.C. §§ 106(6), 301. The right of public performance afforded by Congress to these sound recordings is carefully

circumscribed, and Pandora is entitled to a compulsory license with rate-setting by a specialized federal tribunal for its digital radio transmissions and the reproductions made to facilitate them. Pandora also performs sound recordings fixed before February 15, 1972 ("pre-1972 recordings"). These sound recordings were deliberately left unprotected by federal copyright law, notwithstanding decades of complaints by the recording industry that radio broadcasters and others were performing the recordings for profit without compensation to record labels or performing artists. For decades, Congress, the U.S. Copyright Office, the recording industry, and broadcasters alike uniformly understood performances of pre-1972 recordings to be free of state or federal regulation.

The district court's ruling that New York state law provides a public performance right for pre-1972 recordings instantly brands thousands of entities doing business in New York—including AM/FM broadcasters, restaurants, bars, bowling alleys, hotels, health clubs, and public and private educational institutions—as copyright infringers. This stark ruling reflects none of the balancing of competing interests that infuses federal copyright law's treatment of the scope and degree of exclusive rights in the performance of sound recordings. It declares a far broader scope of rights in pre-1972 recordings under New York law than Congress determined to be applicable with respect to post-1972 recordings.

The latitude afforded owners of pre-1972 recordings by the decision below

3

includes the unfettered discretion to withhold altogether New York consumers' access to pre-1972 recordings, or to condition such access upon entities like Pandora's payment of potentially confiscatory license fees.  In the interests of promoting digital commerce, as well as in furtherance of copyright law's paramount interest in fostering wide dissemination of works of creative expression, federal copyright law protects entities like Pandora from precisely such arbitrary exertions of monopoly power in relation to post-1972 recordings.   Against a backdrop of Congress's explicit refusal to incorporate *any* protection whatsoever to performances of pre-1972 recordings, the results brought about by the decision below are as extraordinary as they are anomalous.

All prior experience in this field counsels judicial caution in declaring a new and unexpected copyright right that will directly and adversely affect the operations of thousands of New York entities.  Judgments as to how to balance the competing public policy interests implicated in affording rights in pre-1972 recordings are instead the proper province of the legislature.  The ruling of the district court should be reversed.

## SUMMARY OF ARGUMENT

I.     Any decision to create a new state-law public performance right should be made, if it all, by the legislature, not by a federal court.  The district court's recognition of that right threatens a careful balance, struck nationwide, that

4

ensures the public's uninterrupted access to sound recording performances as afforded by, among others, digital radio services like Pandora and Sirius XM and their broadcast radio competitors. In fact, pre-1972 recordings are regularly performed without licenses by bars, restaurants, museums, public educational institutions, hotels, health clubs, bowling alleys, and retail establishments, among others. If the district court's decision is upheld, all such entities engaging in such performances in New York could be sued for infringement. Such a sea change in the law is exclusively the province of the legislature. Courts are not institutionally competent at balancing the competing policy interests at stake.

II.    Congress enacted an analogous federal public performance right in post-1972 recordings only after long deliberation. When it did so, it circumscribed the right so that it would not be unduly burdensome or disruptive. Congress limited the new right to "digital audio transmissions," 17 U.S.C. §106(6), thereby exempting traditional "terrestrial" radio broadcasters, as well as those engaged in the transmission of audio-visual materials, such as films and television programs. Even as to digital radio providers like Pandora, Congress accompanied the limited new right with statutory compulsory licenses. An industry-wide clearinghouse has been vested with unique authority to administer these statutory licenses, and a specialized tribunal of administrative law judges has exclusive jurisdiction to adjudicate disputes over rates and licensing terms. And Congress has created safe

5

harbors to protect online service providers from liability for performances caused by users who post material without the provider's knowledge or control.

In marked contrast, the state common law right in public performances declared by the district court is completely undefined. The district court did not carefully draw boundaries to accommodate competing interests. There is no centralized registry of common-law right owners, like the U.S. Copyright Office, nor is there a duly empowered clearinghouse to administer the right or a specialized tribunal to adjudicate disputes. There are no clearly defined safe harbors. Only the legislature could create this necessary infrastructure.

III.    If the decision below is affirmed, numerous constituencies will be harmed without any corresponding benefit to the public of greater access to creative works. Pandora, like other digital radio services that rely on the federal copyright statute's assurance of access to sound recordings, may need to remove some or all pre-1972 recordings from its service, to the detriment of both Pandora and those listeners who enjoy such recordings. Such a result would be particularly unfair, given that Pandora would be forced by New York law to remove recordings from its nationwide service, including in states where, by statute or prior judicial decision, the claimed existence of a public performance right in pre-1972

recordings has been expressly denied.[2]

Numerous other constituencies, many unacknowledged in the district court's decision, also will be impaired. Because the state right announced by the district court affords no basis for distinction between digital radio services like Sirius XM and traditional radio broadcasters, terrestrial broadcasters will be unable to play pre-1972 recordings without licenses either. Thousands of small businesses will be in the same position, with even fewer resources available to undertake the effort to try to clear the rights to the music that can be heard by their customers. Local television broadcasters, cable television distributors, and online video programming distributors that, without choice, perform sound recordings embedded by the third-party producers of the television programs they transmit will be required to screen all content for pre-1972 recordings or face potential liability. Even online service providers may face liability for conduct that would otherwise fall within the explicit safe harbors of the Digital Millennium Copyright Act ("DMCA").

These myriad harms are not offset by any benefits to the public of greater access to creative works. In arguing against the Copyright Term Extension Act ("CTEA"), a distinguished group of nearly twenty economists concluded that "in

---

[2] Pandora does not have the technological capability to isolate and screen only those subscribers located in New York at the moment of a given performance.

the case of term extension for existing works, the sizable increase in cost is not balanced to any significant degree by an improvement in incentives for creating new works." Brief for George Akerlof *et al.* as *Amici Curiae* Supporting Petitioners at 2, *Eldred v. Ashcroft*, 537 U.S. 186 (2003) (No. 01-618). The Supreme Court upheld the CTEA, in part, because "we defer substantially to Congress. *Sony* [*Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)] ('[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.')." *Eldred v. Ashcroft*, 537 U.S. 186, 204-05 (2003). As in *Eldred*, courts should defer to the legislature to determine whether to provide a significant expansion of copyright rights, such as the exclusive right of public performance for pre-1972 recordings announced by the district court here.

## **ARGUMENT**

### I. **The Legislature, Not The Courts, Should Balance The Competing Interests And Make The Policy Choices Involved In The Creation Of A Public Performance Right For Pre-1972 Recordings**

Copyright law has always "reflect[ed] a balance of competing claims upon the public interest. . . ." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). On the one hand, "[c]reative work is to be encouraged and rewarded," in the form of exclusive rights conferred on the creators. *Id.* On the other, "private

motivation must ultimately serve the cause of promoting broad availability of literature, music, and the other arts." *Id.* For nearly 100 years, it was universally understood by Congress, the U.S. Copyright Office, the recording industry, and broadcasters alike that the balance of competing public and private interests at stake had been struck against recognizing a public performance right for sound recordings. *See infra* Point II.

Because of the broad policy implications of creating a new performance right in pre-1972 recordings, it is not the kind of property right that ordinarily is, or should be, devised by the accretion of common law. Rather, the task of determining the existence and scope of any public performance right in sound recordings is "best and more appropriately explored and resolved by the legislative branch of our government." *Hall v. United Parcel Serv. of Am., Inc.*, 76 N.Y.2d 27, 34 (1990) (citation and internal quotation marks omitted). That is precisely how the analogous federal performance right for post-1972 recordings evolved.

When Congress first created a public performance right for post-1972 recordings, it made a host of nuanced policy choices, including: (i) limiting the performance right to digital audio transmissions; (ii) exempting non-subscription broadcast transmissions and certain retransmissions; (iii) providing compulsory licenses and a rate-setting tribunal for non-interactive Internet and satellite radio services like Pandora and Sirius XM for not only public performance but also

associated ephemeral copies of recordings made in aid of performance; (iv) ensuring that specific percentages of royalties would be paid directly to featured artists and non-featured musicians and vocalists; and (v) subjecting the performance right to a host of statutory defenses; among many others. *See, e.g.*, 17 U.S.C. §§ 106(6), 107-112, 114; *see generally infra* Point II.

Policy choices like these, which affect broad constituencies and balance competing public and private interests with nuanced line-drawing, are the exclusive province of the legislature. The courts are not institutionally competent to determine exactly which entities are (or are not) able to bear the costs of obtaining licenses, or to define the myriad other accommodations necessary to make a public performance right feasible for pre-1972 recordings.[3] *See Hall*, 76 N.Y.2d at 34 ("The Legislature has infinitely greater resources and procedural means to discern the public will, to examine the variety of pertinent considerations, to elicit the views of various segments of the community that would be directly affected, and to investigate and anticipate the impact of imposition of [] liability.") (citation omitted); *see* Appellant Sirius XM's Br. at 21 (citing *Sony Corp. of Am.*,

---

[3] Even if the courts could do so, it is grossly unfair to the affected constituencies to roll out rules like these in case-by-case decision-making—let alone apply them retroactively, as the decision below appears to contemplate. The numerous entities and individuals who would be bound by the new common-law rule ought to be given a fair opportunity to conform their conduct to its requirements in advance. Statutes can afford this opportunity by defining the contours of a right in detail and by doing so on a purely prospective basis.

10

464 U.S. at 431 (the legislature "has the constitutional authority and institutional ability to accommodate fully the varied permutations of competing interests" as to "the protections afforded by copyright")).

The New York Court of Appeals has made it clear that "the Judiciary has a duty 'to defer to the Legislature in matters of policymaking.'" *Campaign for Fiscal Equity, Inc. v. State*, 8 N.Y.3d 14, 28 (2006) (citation omitted). To be sure, the courts develop the common law, but they usually do so by "deciding cases and settling the law more modestly"—not by "dramatic promulgation[s]" that effect a "sweeping [] change" in the law. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 467 (1998). Such "drastic" "law creation" is "often said and thought to be an invalid encroachment on the legislative branch." *Id.* at 468 (citation omitted). The courts should not "intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches." *Klostermann v. Cuomo*, 61 N.Y.2d 525, 541 (1984). This is especially true where, as here, a judicially created legal rule would disrupt reasonable, investment-backed expectations and potentially subject companies to retroactive damages notwithstanding decades of acquiescence by the recording industry in the newly-challenged conduct.

The district court acknowledged at least some of the widespread effects of its decision, including "significant economic consequences" like "upset[ting] []

11

settled expectations," "exposing [other broadcasters] to significant liability," and "upend[ing] the analog and digital broadcast industries." SPA-39-40.[4]  But, the lower court said, "[t]he broader policy problems are not for me to consider.  They are the province of Congress, the New York Legislature, and perhaps the New York Court of Appeals."  *Id.* at 40.  The problem with this reasoning is that, by declaring a hitherto unknown intellectual property right that affects broad segments of the public, the court was *making* the policy choices, not avoiding them.

Even if a public performance right in pre-1972 recordings could be created as a matter of New York common law, a federal district court would not be the court to do it.  The "role [of] a federal court" confronted with an issue of state law is "to construe and apply state law as [it] believe[s] the state's highest court would."  *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1153 (2d Cir. 1989).  "The federal courts, however, *cannot create New York common law*."  *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 911 n.3 (2d Cir. 2011) (emphasis added).  "That task is reserved for New York courts."  *Id.*

As the district court here acknowledged, the question whether New York common law confers an exclusive right of public performance is "one of first impression  . . . which no appellate court in New York has yet confronted."  SPA-

---

[4] The citations to "SPA" refer to the Special Appendix filed by Sirius XM.

16 (citation omitted).  Thus, "[t]o permit plaintiffs to recover in this action would not involve applying settled New York law to the facts, but instead would significantly extend its principles well beyond the limits of the reported New York cases."  *Garland v. Herrin*, 724 F.2d 16, 20 (2d Cir. 1983).  It is well-settled that "[a] federal court should not make such a policy-based extension of state law."  *Id.* (quoting *Cornellier v. Am. Cas. Co.*, 389 F.2d 641, 644-45 (2d Cir. 1968)); *see also City of Johnstown, N.Y.*, 877 F.2d at 1153 (the federal court's role is "not to adopt innovative theories that may distort established state law"); *Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 130 F. Supp. 2d 440, 446 (S.D.N.Y. 2000) ("federal courts do not create state law").

## II.  The District Court's Determination That A Public Performance Right In Sound Recordings Has Always Existed Under New York Law—But Went Unenforced—Is Undermined By The Extensive History Of Failed Legislative Efforts To Secure Such A Right And The Carefully Circumscribed Nature Of The Federal Public Performance Right

The district court cited the New York Court of Appeal's decision in *Capitol Records, Inc. v. Naxos of America, Inc.*, 4 N.Y.3d 540 (2005) ("*Naxos*"), for the proposition that "[w]hen examining copyright law, a page of history is worth a volume of logic."  SPA-17 (quoting *Naxos*, 4 N.Y.3d at 546).  The district court proceeded to surmise that "[i]t is not surprising that sound recordings . . . received little attention from courts before they became eligible for statutory copyright.  It is likely that the issue was just not on anyone's radar screen until Congress granted a

13

public performance right in more recent sound recordings." SPA-19-20. But the controversial and contested issue of whether sound recordings should be afforded a performance right unquestionably has been on the "radar screen" of record labels, performing artists, and music users alike for nearly 100 years. The district court all but ignored the extensive history of efforts by the recording industry to secure a federal performance right for sound recordings, *precisely because* there was no such right available under state law.

Record companies pursued performance rights in sound recordings before Congress as early as the 1920s, without success. H.R. Rep. No. 104-274, at 10 (1995); *see, e.g.*, H.R. 10434 § 37, 69th Cong. (1926). For example, during the 1932 general revision hearings, the National Association of Broadcasters ("NAB") opposed performing rights by observing that, at the time, "a station [that] broadcasts a phonograph record" is "responsible" to the composer "but not to the manufacturer of the phonograph record." *General Revision of the Copyright Law: Hearings Before the H. Comm. on Patents*, at 193 (1932). The NAB testified that the extension of performing rights to sound recordings "would be very prejudicial to the smaller broadcasting stations," which would become subject to "two license fees" or "may find that he is forbidden to play phonograph records altogether." *Id.* The bill was not passed.

As another example, in 1947, a bill was introduced that would have extended copyright, including performing rights, to sound recordings. H.R. 1270, 80th Cong. (1947). Performers again confirmed the absence of any public performance right by arguing that "use of records . . . has become standard practice with hundreds of radio stations," to which the performer "has *no rights at all* beyond an original agreement with the manufacturer." *Authorizing a Composer's Royalty in Revenues from Coin-operated Machines and to Establish a Right of Copyright in Artistic Interpretations: Hearings Before Subcomm. on Patents, Trade-marks, and Copyrights of the H. Comm. on the Judiciary on H.R. 1269, H.R. 1270, and H.R. 2570*, at 6 (Comm. Print 1947) (emphasis added).[5] Broadcasters and author-composers vigorously opposed the bill because it "would make the control go away entirely from the creator and . . . put it into the hands of the maker of the record," who "would then be in a position to control whether it was played

---

[5] Indeed, because performing artists were well aware that there were no performance rights in sound recordings under state or federal law, the American Federation of Musicians organized boycotts against the recording of new music in an effort to force broadcasters, bars, and hotels to hire live performers who were otherwise being displaced by uncompensated performances of recorded music. *See* MICHAEL JAMES ROBERTS, TELL TCHAIKOVSKY THE NEWS: ROCK 'N' ROLL, THE LABOR QUESTION, AND THE MUSICIANS' UNION, 1942–1968 (Duke Univ. Press 2014). These boycotts were so successful that Congress passed the Lea Act, which made it unlawful for musicians to threaten or compel a broadcaster to hire more persons than it needed. *See* ROBERT D. LEITER, THE MUSICIANS AND PETRILLO 159 (Bookman Associates 1953).

or not played in a juke box . . . [or] in recorded form over the air." *Id.* at 49. The bill was "adversely reported." 93 Cong. Rec. D406 (daily ed. July 21, 1947).

In 1965, the Register of Copyrights submitted to Congress a Supplementary Register's Report explaining the latest bill seeking sound recording copyright including public performance rights. *See Supplementary Register's Report on the General Revision of the U.S. Copyright Law* (1965), *available at* 9 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, App. 15 (Lexis 2013) ("*Supplementary Register's Report*"); H.R. 4347, 89th Cong. (1965); S. 1006, 89th Cong. (1965). The Register explained that, while there was "little dispute" over affording exclusive reproduction and distribution rights, "exclusive rights of public performance" were "explosively controversial." *Supplementary Register's Report*, at 51. The Report concluded:

> [W]e cannot close our eyes to the tremendous impact a performing right in sound recordings would have throughout the entire entertainment industry. We are convinced that, under the situation now existing in the United States, the recognition of a right of public performance in sound recordings would make the general revision bill so controversial that the chances of its passage would be seriously impaired.

*Id.* at 51-52. In 1967, the House Judiciary Committee, when reporting a new bill, echoed the Register's sentiments by explaining that it "believe[d] that the bill, . . . in denying rights of public performance, represents the present thinking of other

16

groups on that subject in the U.S. and that further expansion of the scope of protection for sound recordings is impracticable."  H.R. Rep. No. 83, at 65 (1967).[6]

In accord with this prevailing consensus, when Congress first extended copyright protections to sound recordings in 1971—on a prospective basis only—it declined to include a right of public performance.  Sound Recording Act of 1971, Pub. L. No. 92-140 § 1(a), 85 Stat. 391 ("SRA of 1971").  Congress explained that the purpose of the "limited copyright" was "protecting against unauthorized duplication and piracy of sound recordings . . . ."  117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971).  It sought to bring uniformity to the patchwork of laws combatting record piracy and eliminate the confusion between proliferating state laws on the issue.  *See* S. Rep. No. 92-72, at 4 (1971); H.R. Rep. No. 92-487, at 2-3 (1971).  As Congress later observed, it did "not grant[] the rights of public performance [in 1971], on the presumption that the granted rights would suffice to protect against record piracy."  H.R. Rep. No. 104-274, at 11 (1995).

Certainly, had there actually been public performance rights in existence at the time under state law, Congress would have had no qualms about extending that right to post-1972 recordings (as it did with the reproduction right).  Indeed,

---

[6] To the limited extent that the district court grapples with this legislative history at all, it is to conclude that the failure of recording companies and performing artists to "demand[] [] royalties under the common law . . . is, in many ways, inexplicable."  SPA-18.  The obvious explanation, however, is that no common law right existed.

17

Congress similarly would have sought to unify the law on the topic of any state law performance rights. But there were none. Further, if the performance right had existed at the state level as of 1971, Congress's decision *not* to extend the performance right to post-1972 recordings would have reflected a dramatic diminution of the rights of record owners, whose pre-1972 recordings would enjoy a performance right (under state law) but whose post-1972 recordings would enjoy no such right (under federal law). That reading cannot be reconciled with the legislative history.

When Congress ultimately conferred a public performance right for sound recordings under federal copyright law in 1995, it did so specifically to alleviate the "effects" that "new technologies" like digital radio broadcasting had on the recording industry. H.R. Rep. No. 104-274, at 12. It did not simply announce the bare existence of a "right" and leave it at that. Rather, it developed an elaborate statutory system to define the newly established right and accommodate competing policy considerations. *See* 17 U.S.C. §§ 106(6), 114(d), 114(f), 801-805. In extending a limited performing right for the first time, it was careful to do so "without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades." H.R. Rep. No. 104-274, at 12.

18

Reflecting these important policy considerations, the narrow federal sound recording public performance right that Congress enacted is constrained by a litany of limitations, exceptions, and protections.  17 U.S.C. §§ 106(6), 114, 801-805. For one, the right applied prospectively only, affording the affected industries time to undertake compliance without punishing them for past, lawful conduct.  *See* SRA of 1971, at §§ 2(3), 6.  Traditional broadcasts are exempt, whether digital or analog.  *See* 17 U.S.C. § 114(d)(1)(A) (exempting "digital audio transmission[s], other than as part of an interactive service" as long as "the performance is part of . . . a nonsubscription broadcast transmission").  Other key exemptions apply to transmissions "within a business establishment, confined to the premises or the immediately surrounding vicinity," and to "a retransmission by any retransmitter" as long as the underlying transmission is licensed.  17 U.S.C. § 114(d)(1)(C)(ii), (iii).

Just three years later, Congress added another important policy accommodation which limits the public performance right.  In enacting the DMCA, Congress acknowledged the significant risk of unintentional infringement by digital service providers when *users* of the services post infringing content.  *See* 17 U.S.C. § 512.  Accordingly, Congress established a notice-and-takedown system through which copyright owners and service providers can work together to

19

resolve infringement and which affords service providers a statutory safe harbor from liability. 17 U.S.C. § 512(a), (c)(1)(C).

Congress also limited the scope of the public performance right to avoid holdout problems. The federal public performance right in sound recordings does not empower the rights-owners to preclude performances of the works by noninteractive Internet radio services like Pandora. *See* 17 U.S.C. § 114(d)(2). Rather, Congress ensured that performances of covered recordings would remain authorized by providing for a compulsory statutory license. *See* 17 U.S.C. § 114(d)(2), (f). These statutory licensing provisions were designed to ensure that satellite and Internet radio would maintain uninterrupted access to records at a reasonable, centrally regulated price. *See* H.R. Rep. No. 104-274, at 14, 22-23.

The compulsory licenses created under this system are administered by SoundExchange, which the Copyright Royalty Board ("CRB") has designated to be the sole organization authorized to collect and distribute royalties for exclusive rights in sound recordings. *See generally* 37 C.F.R. §§ 380, 382-84 (2014). Congress also established a complex rate-setting process for compulsory licenses and vested authority in the CRB to adjudicate disputes over licensing rates and terms. *See* 17 U.S.C. §§ 114(f), 801-805.

In stark contrast to this comprehensive federal statutory scheme, the state public performance right fashioned by the district court lacks any visible definition

20

or detail.  *See* SPA-14-25.  Indeed, the entire thrust of Plaintiff's argument has been that a common law public performance right is a natural property right that admits of no exceptions.  Flo & Eddie's Mem. of Law in Opp'n to Sirius XM's Mot. for Summ J. at 12, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325 (S.D.N.Y. 2014) (No. 13 Civ. 57684 (CM)) (arguing that "under New York law . . . the right and ability to exclude others from profiting from a recording is unqualified").  There is no guaranteed access for historically protected industries like Pandora's.  No deliberative body can hold hearings and tailor the right to accommodate the competing interests of different constituencies.  Users will be unable to learn the contours of the right until they are haled into court, accused of violating it.

Even if a user wanted to negotiate a common law license, it may not be feasible to do so, as the recording industry has itself acknowledged.  *See* "Comments of Recording Industry of America (RIAA) and American Association of Independent Music (A2IM)," at 24-28, *In the Matter of: Fed. Copyright Protection of Sound Recordings Fixed Before Feb. 15, 1972*, Dkt. No. 2010-4, U.S. Copyright Office (Jan. 31, 2011).  Pre-1972 recordings—a category stretching back to the turn of the century—are, by now, at least forty-four years old, and it may be quite difficult to discern who, if anyone, continues to own rights in them.  Record labels go out of business.  Artists and bandleaders die without clear heirs.

21

There is no central registry of common-law right-holders, like the U.S. Copyright Office, nor is there any organization authorized to administer the rights, like SoundExchange.  Users could expend significant time and resources obtaining licenses and still face infringement liability when a new party comes along and claims to be the rightful owner.

The district court protested that courts are "hardly powerless to craft the sort of exceptions and limitations Congress has created," and cites as examples the ASCAP and BMI consent decrees administered by the S.D.N.Y. as a "rate court." SPA-25.  But, while a court did *approve* those consent decrees, the terms and conditions under which ASCAP and BMI have been afforded an antitrust lease on life emanate from years of government litigation over collusive behavior and the undue exercise of market power by unregulated music performing rights collectives, and necessarily involve the ongoing participation and oversight of the U.S. Department of Justice.  *See*, *e.g.*, *Broadcast Music, Inc. v. DMX, Inc.*, 683 F.3d 32, 36 (2d Cir. 2012) (discussing history of government "antitrust complaints" against performing rights organizations for "unlawfully monopolizing the licensing of performing rights"); *Meredith Corp. v. SESAC, LLC*, 1 F.3d 180, 213-14 (S.D.N.Y. 2014) (reviewing history of antitrust litigation against organizations engaged in collective licensing of music performing rights and finding evidence sufficient to support antitrust liability for performing rights

organization not regulated by government consent decree). So the district court's speculation that a central licensing system for common law performance rights could be *privately* organized by the thousands of owners of pre-1972 recordings is incorrect. *See* SPA-57. Any such endeavor would be fraught with antitrust risk. This recognition underscores the complexity of devising a workable music license marketplace for pre-1972 recordings and the wisdom of remitting such considerations to a legislature.

## III. The District Court's Decision, If Affirmed, Will Unleash Widespread, Inequitable Burdens On Numerous Industries

The district court was correct insofar as it acknowledged that its holding "is unprecedented . . . and will have significant economic consequences." SPA-39. The district court was also correct to observe that recognizing a state law performance right for pre-1972 recordings "rais[es] the specter of administrative difficulties in the imposition and collection of royalties, which would ultimately increase the costs consumers pay to hear broadcasts, and possibly make broadcasts of pre-1972 recordings altogether unavailable." SPA-24. And the district court was unquestionably correct that "[o]ther broadcasters, including those who publicly perform media other than sound recordings, will undoubtedly be sued in follow-on actions, exposing them to significant liability." SPA-40. For the reasons discussed in Points I and II *supra*, however, the district court clearly erred

23

in concluding that "[t]he broader policy problems are not for me to consider," when deciding this issue of first impression. *Id.*

On the contrary, the broader policy problems counsel against judicial creation of a state law right of public performance. The district court's undefined public performance right in pre-1972 recordings would suddenly overturn a century's worth of accepted industry practice, carefully preserved by Congress.[7] Entire industries, developed over decades according to reasonable and justifiable expectations, should not face this kind of upheaval and the threat of significant retroactive liability because of a judicially created common law right. A mere sampling of the deleterious and impractical consequences of the district court's ruling, and the resulting risk of self-censorship that will limit public access to performances of pre-1972 recordings across a variety of industries, are discussed below.

A.    Satellite And Internet Radio Services

With respect to its digital transmissions of post-1972 recordings, Pandora has operated pursuant to the statutory license provisions of Sections 112 and 114 of the Copyright Act. Compulsory licenses afford Pandora unlimited access to

---

[7] Nothing in the record of this case supports the existence of a distinction between traditional and digital broadcasters under state law, as the district court acknowledged by foretelling the "profound economic consequences" threatened for both the "analog and digital broadcast industries," and the likelihood of follow-on actions for other radio broadcasters. SPA-16; *see also* SPA-55.

recordings in return for reasonable license fees either as may be negotiated with a record industry clearinghouse (operating with a limited antitrust exemption), 17 U.S.C. §§ 112(e)(2), 114(e)(1), or as established by the CRB.

The new public performance right established by the lower court provides no similar structure guaranteeing unfettered public access to pre-1972 recordings, nor any comparable mechanism to avert monopoly pricing by record labels. The ruling foreshadows the imposition of potentially prohibitive transaction and compliance costs with which services like Pandora, let alone countless other smaller music-using entities in New York, may be unable or unwilling to cope. The resulting diminution in the transmission of pre-1972 recordings will be a loss to all interested parties.

Further, because Pandora offers its service on a nationwide basis, a New York right potentially impairs its operations everywhere. To comply, Pandora will be required to create a complex system for identifying which subscribers are located in which states at any given time. Subscribers located in New York will need to be automatically blocked from hearing pre-1972 recordings, a technological capability that Pandora does not currently possess. In the event such a system is impossible to design or prohibitively costly, Pandora will be forced to pull pre-1972 recordings nationwide, even in those states that have expressly rejected the existence of the right Plaintiff has asserted. *See, e.g.*, *Flo & Eddie,*

*Inc. v. Sirius XM Radio, Inc.*, No. 13-23182-CIV, 2015 WL 3852692, at *5 (S.D. Fla. June 22, 2015) ("[T]he Court finds that Florida common law does not provide Flo & Eddie with an exclusive right of public performance in The Turtles' sound recordings."); N.C. Gen. Stat. § 66-28 (2015); S.C. Code Ann. § 39-3-510 (2015).

    B.    <u>Traditional Radio Broadcasters</u>

The new public performance right will apply equally to traditional radio broadcasters, despite Congress's studied and repeated unwillingness to impose such a burden. *See* SPA-24. As the district court noted, "not paying royalties for public performance of sound recordings was an accepted fact of life in the broadcasting industry for the last century." SPA-18. Indeed, not only have record labels historically not demanded license fees from radio broadcasters, they have "spen[t] mi[ll]ions of dollars *promoting* their product to broadcasters" because airplay drives sales. *Testimony of the NAB Before the H. Judiciary Comm. Subcomm. on Courts & Intellectual Property: Hearing on H.R. 1506*, §§ A, C (June 21, 1995) (emphasis added). When Congress fashioned a limited public performance right in sound recordings, it expressly exempted terrestrial radio broadcasters from its scope. 17 U.S.C. § 106(6). Thus, to this day, those traditional broadcasters do not pay for the public performance of any record. The decision below undermines this considered policy judgment.

C.      Restaurants, Bars, And Other Small Businesses

Another, enormous group of traditional record users, unacknowledged in the district court's decision, are the many thousands of New York small business owners that routinely play records for their customers' enjoyment.  Until now, restaurants, bars, retail establishments, and other businesses have never paid anything to perform sound recordings of any kind.  Indeed, Congress specifically exempted many of them from the scope of the federal right even as to the underlying compositions.  *See* 17 U.S.C. §§ 110, 114(d)(1)(C)(ii).

An undefined common law performance right would threaten this long-settled practice.  Any restaurant or bowling alley or club in New York may be sued by the copyright owner of pre-1972 recordings for playing those records on their premises.  And given their lack of resources, these businesses are ill-equipped even to identify owners, let alone negotiate rights to these recordings.  As a result, many could be forced to stop playing pre-1972 recordings for their customers and, to avoid accidental infringement, self-censor other content too.

D.      Local Television Broadcasters and Cable Television System
          Operators

In addition to constraining *intentional and knowing* users of pre-1972 recordings, a new common law public performance right implicates a vast number of *unintentional and unknowing* users that only transmit performances of sound recordings as part of other services.  For example, because the federal performance

27

right in post-1972 recordings is limited to "digital audio transmissions," 17 U.S.C. § 106(6), local television broadcasters have never needed to license the right to perform the copyrighted sound recordings synchronized with the audio-visual programming they transmit. But, under the district court's decision, they may now be required to license pre-1972 recordings. Because much of the programming broadcast on local television is produced by third parties, broadcasters may not even know what sound recordings are being performed, let alone whether they are pre-1972 recordings, or who owns them. *See Meredith*, 1 F.3d at 187-88 ("As a practical matter, a television station cannot negotiate separately with the holder of the rights to each copyrighted work within each of its programs.") (discussing analogous problem for musical compositions). So even though Congress has exempted audio-visual transmissions from the performance right afforded to sound recordings under federal copyright law, broadcasters now risk liability under the lower court's interpretation of New York law.

The potential disruption to long-standing practices for the transmission of television programming to the public is hardly limited to those of local broadcasters. For example, Congress carved out an exception for "retransmissions by any retransmitter" from the scope of federal copyright for post-1972 recordings. 17 U.S.C. § 114(d)(1)(C)(iii). But unless and until the contours of any state-law public performance right are defined, no one will know how it affects

28

retransmissions, such as those made by cable system operators that retransmit programs broadcast on television.

A retransmission of a public performance is itself a public performance. But no cable system operator has ever needed a license for secondary performances of sound recordings featured in the television programming that they retransmit. Accordingly, cable system operators currently have no system in place for identifying recordings that might subject them to liability. In order to prevent future state law liability, retransmitters would need to create and implement procedures for screening all content to be aired for pre-1972 sound recordings, and negotiate licenses accordingly. The resulting transaction and compliance costs would be enormous, if not insurmountable, and they too would be inclined to self-censor content to avoid potential liability, further reducing the storehouse of content available to the public.

*      *      *

Liability under the stark right announced by the district court is hardly limited to the kinds of businesses described above. A host of other entities, ranging from online service providers to non-commercial entities, such as municipalities, educational institutions, and museums, among others, publicly perform music. The policy implications of subjecting such entities to an

29

unqualified and undefined common law performance right are equally far-reaching.

## **CONCLUSION**

For the foregoing reasons, and the reasons set forth in Sirius XM's briefing, the District Court's decisions denying summary judgment and reconsideration should be reversed.

Dated:  New York, New York      Respectfully submitted,
        August 5, 2015

                            /s/ R. Bruce Rich
                            R. Bruce Rich
                            Benjamin E. Marks
                            Gregory Silbert
                            Todd Larson
                            Kami Lizarraga
                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            T:  (212) 310-8000
                            F:  (212) 310-8007

                            *Counsel for Amicus Curiae*

## <u>CERTIFICATION OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,795 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ R. Bruce Rich
R. Bruce Rich